In The


 

Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-03-251 CR


____________________



JAMES WILLIAM KALMBACH, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 221st Judicial District Court


Montgomery County, Texas


Trial Court Cause No. 02-05-03085 CR






MEMORANDUM OPINION


 Appellant, James William Kalmbach, was convicted of the murder of Larry
Chatagnier. The trial court sentenced appellant to thirty-five years of imprisonment.

 Appellant claims that the evidence was factually insufficient to establish his guilt as
a party to the offense under section 7.02 of the Penal Code.



 Section 7.02 of the Penal Code states in relevant part:

 (a) A person is criminally responsible for an offense committed by the
conduct of another if: 

 . . . .


 acting with intent to promote or assist the commission of the offense,
he solicits, encourages, directs, aids, or attempts to aid the other
person to commit the offense[.]



Tex. Pen. Code Ann. § 7.02(a)(2) (Vernon 2003).


 Evidence is sufficient to convict the defendant under the law of parties
where he is physically present at the commission of the offense, and
encourages the commission of the offense either by words or other
agreement. The agreement, if any, must be before or contemporaneous with
the criminal event. To convict someone as a party to an offense, the
evidence must show that at the time of the offense the parties were acting
together, each doing some part of the execution of the common purpose. In
determining whether the accused participated as a party, the court may look
to events occurring before, during and after the commission of the offense,
and may rely on actions of the defendant which show an understanding and
common design to do the prohibited act. 


Cordova v. State, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985) (citations omitted).

 When addressing an issue of factual sufficiency, the appellate court asks whether
"a neutral review of all the evidence, both for and against the finding, demonstrates that
the proof of guilt is so obviously weak as to undermine confidence in the jury's
determination, or the proof of guilt, although adequate if taken alone, is greatly
outweighed by contrary proof." Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000); see also King v. State, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000). An appellate
court "must give due deference to the fact finder's determinations concerning the weight
and credibility of the evidence and will reverse the fact finder's determination only to
arrest the occurrence of a manifest injustice." Swearingen v. State, 101 S.W.3d 89, 97
(Tex. Crim. App. 2003) (en banc). The jury is the ultimate authority on the credibility of
witnesses and the weight to be given their testimony. See Penagraph v. State, 623 S.W.2d
341, 343 (Tex. Crim. App. 1981).

 Jana Powdrill Chatagnier Kalmbach, who was married to Larry Chatagnier, married
appellant shortly after Larry was killed. Prior to Jana's marriage to Larry Chatagnier,
appellant had fathered Jana's oldest daughter. The marriage between Jana and Larry was
often unhappy. When things were not going well between Jana and Larry, Jana would call
appellant, who was then living in California.

 Appellant returned to Texas, and Jana and appellant began seeing each other. Jana
told appellant Larry was physically and mentally abusing her. Jana worked as a waitress
at Cat Balloo's. After learning that Larry had given Jana a black eye and hit her in the
mouth, causing her lip to split, appellant told Nancy Callins, a bartender at Cat Balloo's,
that he was going to hurt Larry. Appellant also told Nancy he would "take care of it" if
Jana and Larry fought anymore, and remarked that he would "beat [Larry] up." Appellant
told Jana to leave Larry if the abuse continued. Jana later left Larry, but she reconciled
with him after he attempted suicide. Appellant learned from Jana that both she and Larry
had life insurance. 

 On the night Larry was killed, he and Jana had a fight, and Jana called appellant. 
Appellant told Jana he would "take care of it," and he instructed Jana to "leave the house
and leave the door unlocked." As instructed, Jana and her infant son went to her brother's
girlfriend's house. Appellant then asked Nancy to transport him and a friend, Harold
"Peewee" Devine, telling her he had "a job to do." Nancy drove appellant and Peewee
to Porter, and she dropped them off on the side of the road. Jana testified that she saw
appellant, Peewee, and Nancy in a car while she was on her way to her brother's
girlfriend's house. Appellant told Nancy to meet Jana at the Hot Biscuit restaurant. 
Nancy met Jana at the restaurant, and they talked for a while. Jana said she needed to
make a phone call, and, when she returned, Jana instructed Nancy to go back toward
Houston to pick up appellant and Peewee. Nancy retrieved appellant and Peewee on the
Highway 59 feeder road. Nancy testified at trial that she was unaware the trip she made
with appellant and Peewee to Porter was related to Larry's murder until she was arrested.

 Officer Self, a patrolman with the Montgomery County Sheriff's Department, 
responded to a call in Porter. Upon arriving at the scene, Officer Self saw Larry lying on
the floor in the front bedroom of the White Oak residence. Officer Self checked the body
for a pulse, and found none. Officer Self noted that the back door was open, and there
were no signs of forced entry. He further noted that the bedroom was in disarray, there
appeared to be high velocity blood spatters on the wall, and a spindle was broken off the
footboard of the bed. An autopsy of Larry's body indicated that he had been shot five
times, stabbed twice, and superficially cut on his neck and shoulder. The autopsy also
revealed that Larry had suffered blunt force trauma to his head. Investigators surmised
that Larry was attacked while he was in bed.

 When the crime scene was further processed by other officers, a knife was found
in the top drawer of a dresser, and a magazine from a .22 rifle was also found. In
addition, a hunting knife was found wrapped in draperies by a neighborhood resident who
purchased some items from the bedroom of the victim's home. Blood was found on both
knives, and testing revealed that the blood on the larger knife was human. Blood grouping
tests were attempted, but the results were inconclusive.

 A few months after Larry's death, appellant and Jana were married. Jana collected
$125,000 from Larry's life insurance policies. Jana testified she knew some of the
proceeds were to be paid to Peewee, and appellant later asked her for that money. 
Appellant's brother, Donald Kalmbach, testified that appellant told him he needed money
from Jana to pay Peewee, whom he had hired to kill Larry. Donald also testified that
appellant told him Jana would not withdraw the money from the bank because "she had
people watching her and every check she wrote." According to Donald, when appellant
obtained the money from Jana, he showed Donald the wad of cash and gloated about it.

 Jana testified that she eventually asked appellant what had transpired, and appellant
told her he and Peewee had beaten, shot, and stabbed Larry. Jana also stated that appellant
told her he and Peewee wore gloves when they killed Larry, and that they threw the gun
into the San Jacinto River. Jana confessed what she knew about the murder to her brother,
Verlon Ray Powdrill, who worked for the San Jacinto County sheriff's department. 
Verlon then took Jana to the Montgomery County sheriff's office. 

 While in a holding tank in the Montgomery County jail, appellant met Carl Lee, and
they talked for approximately two weeks. Lee testified that he saw an article about the
crime with which appellant was charged, and, when he asked appellant about it, it became
obvious that appellant knew the details of the crime. Appellant told Lee that a lady took
him and Peewee to Larry's residence, and that he waited outside while Peewee was inside. 
Lee testified that appellant told him that when Peewee came back outside, appellant went
inside, found Larry lying on the bed, and cut him across the chest to make sure he was
dead. Lee further testified that appellant told him that he and Peewee then left the house
in Larry's car.

 The State concedes Jana and Nancy were accomplice witnesses. Their testimony
must be corroborated by other evidence which tends to connect appellant to the offense. 
Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979); see also Fare v. State, 1 S.W.3d
928, 930 (Tex. App.--Beaumont 1999, pet. ref'd). Carl Lee testified appellant told Lee
that a lady took him and Peewee to Larry's residence on the night Larry was killed;
appellant cut Larry across the chest to make sure he was dead; and appellant told him that
he and Peewee then left the house in Larry's car. Lee's testimony connects appellant to
the offense, as does Donald Kalmbach's testimony that appellant told him he needed money
from Jana to pay Peewee for killing Larry. The testimony of Jana and Nancy was
sufficiently corroborated by other evidence. 

 Nancy testified that appellant had threatened to hurt Larry; that he would "take care
of it" if Jana and Larry continued fighting; and that he "had a job to do" on the night of
the murder. Jana testified that, on the night of the murder, appellant had told her he would
"take care of it," and instructed her to leave the door unlocked. Jana also testified that she
saw Nancy, appellant, and Peewee riding together on the night of the murder. Finally,
Jana testified that appellant later told her that he and Peewee had killed Larry while
wearing gloves, and that they threw the gun into the river. Jana admitted that she blames
appellant for addicting her to drugs; she has problems with her memory; suffers from
depression and a chemical imbalance; has been civilly committed; and blames appellant
because her life became worse after their divorce.

 It is the exclusive province of the jury to assess the credibility of the witnesses and
the weight to be given their testimony. A neutral review of all of the entire record does
not demonstrate the proof of guilt is so obviously weak as to undermine confidence in the
jury's determination, nor does it demonstrate that the proof of guilt is greatly outweighed
by contrary proof. The evidence is factually sufficient to support the verdict. Appellant's
issue is overruled, and the judgment of the trial court is affirmed.

 AFFIRMED. 

 PER CURIAM 

Submitted on July 19, 2004

Opinion Delivered October 13, 2004

Do Not Publish


Before McKeithen, C.J., Burgess and Gaultney, JJ.